## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Randy Green and Clifford Elow, derivatively and on behalf of Cigna Corporation, | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | C.A. No. 20-324-LPS **UNSEALED ON 4/6/21** |
| George Paz, Timothy Wentworth, Eric Slusser, James M. Havel, David Queller, Christopher A. Mcginnis, Christopher K. Knibb, Gary G. Benanav, Maura C. Breen, William J. Delaney, Elder Granger, Nicholas J. Lahowchic, Thomas P. Mac Mahon, Frank Mergenthaler, Woodrow A. Myers, Jr., Roderick A. Palmore, William L. Roper, and Seymour Sternberg, | : : : : : : : : : : : : | |
| Defendants, and | : : : : | |
| CIGNA CORPORATION, | : : | |
| Nominal Defendant. | : : | |

Thomas A. Uebler, Joseph L. Christensen, and Hayley M. Lenahan, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware

Willem F. Jonckheer, Dustin L. Schubert, SCHUBERT JONCKHEER & KOLBE, San Francisco, California

Melinda Nicholson, KAHN SWICK & FOTI LLC, New Orleans, Louisiana

Roger A. Sachar, NEWMAN FERRARA, New York, New York

Attorneys for Plaintiffs Randy Green and Clifford Elow

Paul J. Lockwood, Jenness E. Parker, and Kaitlin E. Maloney, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware

       Attorneys for Defendants George Paz, Timothy Wentworth, Eric Slusser, James M. Havel, David Queller, Christopher A. McGinnis, Christopher K. Knibb, Gary G. Benanav, Maura C. Breen, William J. Delaney, Elder Granger, Nicholas J. Lahowchic, Thomas P. Mac Mahon, Frank Mergenthaler, Woodrow A. Myers, Jr., Roderick A. Palmore, William L. Roper, and Seymour Sternberg

Jarrett W. Horowitz, CONNOLLY GALLAGHER LLP, Wilmington, Delaware

Timothy J. Perla, Jessica L. Lewis, and George F. Manley, WILMER CUTLER PICKERING HALE & DORR LLP, Boston, Massachusetts

       Attorneys for Nominal Defendant Cigna Corporation

## MEMORANDUM OPINION

March 31, 2021
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court is Cigna Corporation's ("Cigna") Motion to Dismiss (D.I. 64) Plaintiffs Randy Green ("Green") and Clifford Elow's ("Elow") (collectively "Plaintiffs") Verified First Amended Consolidated Shareholder Derivative Complaint ("FAC") pursuant to Rule 23.1. (D.I. 28)

Also pending is the motion to dismiss the FAC filed by Defendants George Paz, Timothy Wentworth, Eric Slusser, James M. Havel, David Queller, Christopher A. McGinnis, Christopher K. Knibb, Gary G. Benanav, Maura C. Breen, William J. Delaney, Elder Granger, Nicholas J. Lahowchic, Thomas P. Mac Mahon, Frank Mergenthaler, Woodrow A. Myers, Jr., Roderick A. Palmore, William L. Roper, and Seymour Sternberg (together, the "Individual Defendants"). (D.I. 68)

The Court heard oral argument on both motions on August 19, 2020. (D.I. 99) ("Tr.") For the following reasons, the Court will grant both motions to dismiss with prejudice.

## I.    BACKGROUND

On December 7, 2016, Plaintiff Green filed a shareholder derivative suit in the U.S. District Court for the Eastern District of Missouri against Express Scripts Holding Company ("Express Scripts"), alleging that the Individual Defendants breached their fiduciary duties with respect to the company's relationship with Anthem Inc. ("Anthem"), a health benefits company that previously had a contractual relationship with Express Scripts. (D.I. 1)  All of the Individual Defendants are former Express Scripts officers and directors. (D.I. 28 ¶¶ 83-100)  Four of the Individual Defendants are current Cigna officers and directors. (*Id.* ¶¶ 84, 92, 93, 99)

In 2009, Express Scripts entered into a 10-year contract to provide pharmacy benefits management services to Anthem (the "Anthem Contract"). (*Id.* ¶ 3)  Section 5.6 of the Anthem

1

Contract included a "Periodic Pricing Review" provision, which allowed Anthem to hire an independent consultant to conduct a market analysis every three years. (*Id.* ¶ 125) When Express Scripts entered into the Anthem Contract, it amortized the contract over a 15-year period, anticipating there was a "high probability" (75% to 80% likelihood) that the contract would be renewed for at least five years beyond its expiration date. (*Id.* ¶¶ 33, 135-41, 180)

Anthem began negotiations on the 2015 pricing benchmark early, requesting in October 2014 some $13 billion in pricing concessions during the remaining contract term and $1.8 billion in post-termination concessions. (*Id.* ¶¶ 22, 148) Express Scripts, however, took the position that the Anthem Contract did not require it to provide competitive benchmark pricing. (*Id.* ¶ 149)

In 2015, Anthem notified Express Scripts of certain operational issues and asserted breaches of the Anthem Contract. (*Id.* ¶ 142) Express Scripts attempted to resolve these issues (*id.* ¶¶ 157, 159, 165, 182, 185, 212) and throughout the year also continued negotiating with Anthem (*id.* ¶¶ 167, 196, 207, 211, 230). In March 2015, Anthem purported to invoke its right to conduct a Periodic Pricing Review. (*Id.* ¶¶ 22, 174) On April 1, 2015, Anthem provided Express Scripts with a formal notice of breach related to the pricing negotiations, triggering a cure period under Section 6.2 of the contract. (*Id.* ¶ 175) At a May 6, 2015 meeting, the Express Scripts Board reviewed management's plan "to improve the Company's relationship with Anthem." (*Id.* ¶ 182)

For the remainder of 2015 and the first quarter of 2016, Anthem and Express Scripts had discussions and exchanged proposals regarding the Periodic Pricing Review. (*See, e.g., id.* ¶¶ 196, 207, 211, 219, 230-31, 235, 238) A March 3, 2015 handout to Express Scripts' Compensation Committee stated that the Anthem Contract was one of the company's "most

significant risks" (*id.* ¶ 161 Ex. H at 1128); the Express Scripts Board received identical information the next day (*id.* ¶ 163 Ex. I).

Express Scripts continued to utilize a 15-year amortization period on the Anthem Contract in its Form 10-K for 2015 and all Form 10-Qs for 2016. (*Id.* ¶¶ 33, 135, 180) Then, on April 1, 2015, following more refusals to engage in competitive benchmark pricing, Anthem sent a second notice of breach, arising out of a failure to negotiate. (*Id.* ¶ 175) Anthem publicly reiterated its hope to reach an agreement on the pricing negotiations. (*See* D.I. 70 Ex. 10 at 8)

On behalf of Express Scripts, George Paz confirmed that Express Scripts was "excited to continue productive discussions with Anthem regarding [the] relationship" and was "fully committed to reaching a mutually beneficial agreement and continuing our successful working relationship." (D.I. 28 ¶¶ 225-26; *see also* D.I. 70 Ex. 8 at 3) Throughout 2015, the Express Scripts Board and its committees continued to meet and discuss the Company's relationship with Anthem. (*See, e.g.*, D.I. 28 ¶¶ 161, 163-66, 181-86, 192-93, 198, 209, 216-17)

Anthem then publicly disclosed that it was seeking $3 billion in concessions from Express Scripts. It was also still seeking a resolution: "[A]ll I can tell you at this stage is that dialog will continue, and we're hopeful that still in 2016, we will reach a resolution to this matter that we are engaged in with [Express Scripts]." (D.I. 70 Ex. 11 at 9)

On February 16, 2016, Express Scripts released its fourth quarter 2015 results and 2015 annual report. (D.I. 28 ¶ 239) In them, Express Scripts identified challenges associated with predicting the outcome of the negotiations, stating: "At this time we are unable to provide a timetable or an estimate as to the potential outcome of these events, any of which could result in a material adverse effect on our business and results of operations." (D.I. 70 Ex. 6 at 21) On an earnings call the next day, George Paz stated: "[O]bviously we would love to have an extension

as part of this agreement. And I think it's up to us to negotiate with them and find out what's tolerable and works for them and what's good for us and our shareholders." (*Id.* Ex. 9 at 11)

The parties negotiated but did not reach an agreement. (D.I. 28 Ex. F ¶ 9) On April 24, 2017, Express Scripts announced that Anthem would not renew the Anthem Contract. (*Id.* ¶ 255)

## II.    PROCEDURAL HISTORY

On March 21, 2016, Anthem filed suit against Express Scripts, alleging breach of contract for failing to renegotiate pricing in good faith and failing to remedy various operational shortfalls. (*Id.* ¶ 249) Anthem sought $13 billion in pricing concessions for the remainder of the contract's term, $1.8 billion in post-termination adjustments, $150 million in damages, and immediate contract termination. (*Id.* ¶ 41) At that point, Express Scripts acknowledged internally that the 15-year amortization was no longer appropriate. (*Id.* ¶¶ 232, 249, 252, 254)

Shortly thereafter, Plaintiff Clifford Elow sent a Section 220 demand to Express Scripts, which was refused. (*Id.* ¶ 113 n.15) Elow then filed a Section 220 suit in the Delaware Court of Chancery seeking to enforce the inspection demand, where he prevailed. (*Id.*) Express Scripts subsequently provided the pertinent materials.

On May 5, 2016, stockholders of Express Scripts filed a putative class action suit in the Southern District of New York, alleging violations of federal securities laws (the "Securities Action") and advancing the same theory of securities fraud that Plaintiffs assert here. (D.I. 70 Exs. 3, 4) The district court dismissed that putative class action suit with prejudice, which the Court of Appeals for the Second Circuit affirmed on appeal. (*Id.* Ex. 2)

On September 26, 2016, stockholders of Express Scripts filed a derivative action in the Southern District of New York (the "SDNY Derivative Action") arising out of the same facts as

4

this double derivative suit and the Securities Action. The SDNY Derivative Action, which asserted similar claims as this action, was dismissed pursuant to Rule 23.1 for failing to allege demand futility. (*Id.* Ex. 5)

On December 7, 2016, Plaintiff Randy Green filed a derivative action in the Eastern District of Missouri. (D.I. 1) Green alleged that the directors and officers of Express Scripts breached their fiduciary duties during the Anthem Contract negotiations by: (1) failing to disclose material information and/or making material misstatements; (2) failing to implement adequate internal controls; and (3) engaging in intentional misconduct. (D.I. 1 ¶¶ 146-57) At that time, Cigna was not yet a party to the action. (*Id.*) The district court stayed Green's suit while the parties awaited a ruling in related securities litigation pending in the Southern District of New York.[1] (D.I. 13)

In July 2018, Elow filed a derivative action in the Eastern District of Missouri alleging the same claims as Green. (D.I. 1; D.I. 53 at 2) The Court consolidated the Green and Elow suits (D.I. 18) and stayed the action pending appeal of the securities litigation and the merger between Cigna and Express Scripts. (D.I. 53 at 2)

On December 20, 2018, Cigna and Express Scripts merged, and Express Scripts became a wholly owned subsidiary of Cigna. (D.I. 28 ¶ 53) Plaintiffs sent the Cigna Board a double derivative demand letter (the "Demand") on February 21, 2019. (D.I. 66 Ex. A) The Demand requested that Cigna secure tolling agreements[2] and that the Cigna Board: (1) investigate the

---

[1] *See In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *7 (S.D.N.Y. Aug. 1, 2017).

[2] Plaintiffs requested tolling agreements given their concern that, while the Cigna Board evaluated Plaintiffs' Demand, the statute of limitations would lapse. (D.I. 20 at 4) Specifically, Plaintiffs alleged that, "[i]n order to avoid any possible statute of limitations implications that might bar the Cigna Board from seeking to intervene in the Consolidated Action and pursue

negotiation of the Anthem Contract; (2) initiate disciplinary action; (3) either sue or authorize

Plaintiffs to pursue this action on Cigna's behalf; and (4) commit to an overhaul of Cigna's

corporate governance. (*Id.* Ex. A at 29-32)  On March 14, 2019, the Cigna Board sent a letter to

Plaintiffs, informing them that the Board was considering the Demand.  (D.I. 28-2 Ex. B at 1)

      On April 19, 2019, the Individual Defendants moved to dismiss the Consolidated Action

on the basis that Plaintiffs lacked standing because they were divested of their Express Scripts

stock as a result of the merger.  (*See* D.I. 23)  The Eastern District of Missouri's stay was

subsequently lifted and, on April 26, 2019, Plaintiffs requested that the Cigna Board intervene –

either to prosecute Plaintiffs' claims or seek a stay while the Board reviewed the Demand.  (D.I.

28-3 Ex. C at 2)  Plaintiffs explained that the Board should do so because the statute of

limitations would begin to run, which could prevent Cigna from prosecuting claims on the

Company's behalf against Defendants.  (*Id.*)  Plaintiffs asserted that the filing of the motion to

dismiss triggered a deadline of May 10, 2019 for Plaintiffs to file an amended complaint as a

matter of right pursuant to Federal Rule of Civil Procedure 15.  (*Id.*)  They further requested a

response from the Cigna Board within seven days, arguing that if it did not respond, Plaintiffs

would consider it to have "constructively refused" the Demand.  (*Id.*)

      The Cigna Board responded to Plaintiffs' letter on May 9, 2019, stating that it would

"take appropriate steps to address" the Demand "in a manner that serves the best interests of the

Company and its shareholders."  (D.I. 28-22 Ex. V)  Cigna explained that it "is cognizant of all

---

these claims on behalf of the Company – as Plaintiffs think they should do – or, if appropriate, to
enable Plaintiffs to file an amended complaint asserting that the Cigna Board has authorized
Plaintiffs to continue prosecuting the claims on its behalf or that the Cigna Board failed to
properly consider the demand without any statute of limitations implications, a stay of the
Consolidated Action pending the Cigna Board's review of Plaintiffs' double derivative demand
is appropriate."  (*Id.*; *see also* D.I. 28 ¶¶ 60-61)

potentially relevant statutes of limitations and is fully capable of protecting its rights." (*Id.*)

Plaintiffs and Cigna did not reach an agreement to extend the deadline for amendment. (D.I. 65 at 8) Instead, on May 10, 2019, Plaintiffs filed their FAC, substituting Cigna as nominal Defendant and alleging that Cigna had constructively refused Plaintiffs' Demand. (D.I. 28 ¶¶ 66-75)

On July 2, 2019, the Cigna Board rejected the Demand. (D.I. 66 Ex. B) Cigna's Demand Refusal Letter outlined the factors the Board considered in making its decision, and it also included tolling agreements between Cigna and the Individual Defendants, which provided that:

> Any action, proceeding, claim, cause of action, or lawsuit . . . that could be brought by or on behalf of Cigna or its subsidiary Express Scripts Holding Company against any Party in connection with the allegations raised in the Demand will be treated as if it had been commenced as of the date the Elow Action was filed.

(*Id.* Ex. C at 1)

The specific reasons Cigna provided included the potentially adverse consequences of acting on the Demand while Express Scripts remained involved in substantial litigation with billions of dollars at stake; the Individual Defendants' indemnification rights, that would have rendered pursuing the demanded litigation expensive and wasteful for Cigna; and the unlikelihood of recovering anything close to the asserted billions of dollars in damages from individuals, even if the underlying suit had merit. (*Id.* Ex. B at 7-8)

On July 8, 2019, Cigna moved to dismiss the FAC, arguing the case should be dismissed under the doctrine of *forum non conveniens*, given a forum-selection provision in Cigna's bylaws requiring all derivative cases to be filed in Delaware, and further arguing that the Cigna Board did not constructively refuse the Demand. (D.I. 36; D.I. 37) The Missouri District Court

7

transferred the case to this Court on March 4, 2020 and reserved Cigna's motion to dismiss as it pertained to demand refusal. (D.I. 53)[3]

## III.   LEGAL STANDARDS

### A.    Rule 23.1

Federal Rule of Civil Procedure 23.1 applies "when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a). The derivative action may only be maintained if the plaintiff "fairly and adequately represent[s] the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." *Id.* To maintain a derivative suit, the plaintiff must have owned shares in the company at the time of the disputed transaction. *See* Fed. R. Civ. P. 23.1(b)(1).

In addition, a derivative complaint must "state with particularity" "(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Put another way, Rule 23.1 requires that a shareholder plaintiff make a pre-suit demand on the board of directors before filing a derivative suit on behalf of the company, or to provide a satisfactory explanation for why the plaintiff has not done so. This demand requirement allows the corporate machinery to self-correct problems and helps safeguard against frivolous lawsuits. *See Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007).

---

[3] The parties and the Court agree that Plaintiffs have double derivative standing by virtue of their receipt of shares of Cigna stock as part of the merger. (Tr. at 59, 61-62; D.I. 17; D.I. 20; D.I. 25) Given the Court's decision to dismiss with prejudice, the Court does not reach the issue of whether Express Scripts must be joined as a necessary party. (*See, e.g.*, Tr. at 30-31)

"Although Rule 23.1 provides the pleading standard for derivative actions in federal court, the substantive rules for determining whether a plaintiff has satisfied that standard are a matter of state law." *King v. Baldino*, 409 F. App'x 535, 537 (3d Cir. 2010) (internal quotation marks omitted). Here, the parties agree that Delaware law applies.

In order to excuse the demand requirement under Delaware law, a derivative complaint must allege particularized facts sufficient to cast "reasonable doubt" over: (1) the directors' disinterestedness and independence; or (2) the directors' "valid exercise of [their] business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814-15 (Del. 1984); *see also Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000). If either prong is satisfied, the demand requirement is excused. *See Brehm*, 746 A.2d at 256; *see also In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 170 (D. Del. 2009).

In cases where a shareholder serves a demand that is rejected by the board of directors, the derivative plaintiff's demand is considered a "tacit[] conce[ssion of] the independence of a majority of the board to respond." *Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990). In other words, by serving a demand, the plaintiff waives any argument that the board was incapable of acting independently on the demand. *See Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 976 (Del. Ch. 2013) ("By making a litigation demand on a board of directors, a stockholder concedes that the board is able to evaluate the demand, free from concerns of conflicts of interest or lack of independence."); *but see Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 74-75 (Del. 1997) ("It is not correct that a demand concedes independence conclusively and *in futuro* for all purposes relevant to the demand. . . . [A] board that appears independent *ex ante* may not necessarily act independently *ex post* in rejecting a demand.") (internal quotation marks omitted), *overruled on other grounds by Brehm*, 746 A.2d 244. As a result, "the decision to

refuse demand is treated as any other disinterested and independent decision of the board – it is subject to the business judgment rule," and the "only issues" left for the Court to examine are "the good faith and reasonableness of [the board's] investigation." *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *24 (Del. Ch. May 8, 2015) (internal quotation marks omitted), *aff'd sub nom. Ironworkers Dist. Council of Phila. v. Andreotti*, 132 A.3d 748 (Del. 2016).

The combination of Rule 23.1 and Delaware law places on plaintiffs whose demand has been refused the "heavy" burden of alleging "particularized facts that raise a reasonable doubt" that (1) the board's decision was "consistent with its duty of care to act on an informed basis;" or (2) the board "acted in good faith, consistent with its duty of loyalty." *Id.*; *see also Scattered Corp.*, 701 A.2d at 75 ("Failure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation. Such failure could constitute wrongful refusal.").

### B.    Special Pleading Requirements For Securities Fraud

Securities fraud is defined in § 10(b) of the Securities Exchange Act of 1934. As the Supreme Court explained in *Dura Pharms., Inc. v. Broudo*, § 10(b) forbids the use or employment of any deceptive device "in connection with the purchase or sale of any security . . . in contravention of Securities and Exchange Commission rules and regulations." 544 U.S. 336, 341 (2005) (internal quotation marks omitted). Pursuant to its statutory authority, the SEC promulgated Rule 10b-5, which states: "[i]t shall be unlawful . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To state a claim for securities fraud under § 10(b), a plaintiff must allege:

> (1) a material misrepresentation (or omission); (2) scienter, i.e., a
> wrongful state of mind; (3) a connection with the purchase or sale
> of a security; (4) reliance, often referred to in cases involving
> public securities markets (fraud-on-the-market cases) as
> "transaction causation;" (5) economic loss; and (6) "loss
> causation," i.e., a causal connection between the material
> misrepresentation and the loss.

*Dura Pharms.*, 544 U.S. at 341-42 (internal citations omitted).

When making these allegations, plaintiffs are required to adhere to the heightened

pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 (the

"PSLRA") and Federal Rule of Civil Procedure 9(b). *See In re Suprema Specialties, Inc. Sec.*

*Litig.*, 438 F.3d 256, 276 (3d Cir. 2006). The PSLRA requires plaintiffs to specify "each

statement alleged to have been misleading, the reason or reasons why the statement is

misleading, and, [for allegations] made on information and belief, the . . . facts on which that

belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see also In re Suprema*, 438 F.3d at 276.

The PSLRA also requires plaintiffs to plead the required state of mind with particularity.

*See* 15 U.S.C. § 78u-4(b)(2) ("[T]he complaint [must] . . . state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind."); *GSC Partners*

*CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). A plaintiff can meet the "strong

inference" requirement by "alleging facts to show that [the defendant] had both motive and

opportunity to commit fraud" or by "alleging facts that constitute strong circumstantial evidence

of conscious misbehavior or recklessness." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d

1410, 1418 (3d Cir. 1997).

A plaintiff alleging securities fraud must also adhere to the heightened pleading

requirements of Rule 9(b), which requires plaintiffs to "support their allegations of securities

fraud with all of the essential factual background that would accompany 'the first paragraph of

any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citation omitted).[1]

### C.    Rule 12(b)(6) Motion to Dismiss

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory*, 114 F.3d at 1420 (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

A well-pleaded complaint must contain more than mere labels and conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff must plead facts sufficient to show that a claim has substantive plausibility. *See Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014). A complaint may not be dismissed, however, for imperfect statements of the legal theory supporting the claim asserted. *See id.* at 11.

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). A claim is facially plausible "when the plaintiff pleads factual

---

[1] To the extent that the pleading requirements of the PSLRA conflict with those of Federal Rule of Civil Procedure 9(b), the PSLRA takes priority. *See In re Suprema*, 438 F.3d at 277.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

The Court's review is limited to the allegations in the complaint, exhibits attached to the complaint, documents incorporated by reference, and items subject to judicial notice. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## IV.    DISCUSSION

### A.    There Was No "Constructive" Demand Refusal

#### 1.    Defendants' Actions Did Not Amount To Constructive Refusal

Plaintiffs allege that Cigna's failure to act by May 3, 2019, either by intervening or securing a tolling agreement, was a constructive refusal of the February 21, 2019 Demand. (D.I. 76 at 10-13) To establish a claim for constructive demand refusal, a plaintiff shareholder must raise "a reasonable doubt that the board's actions are in compliance with its fiduciary duties." *Rich*, 66 A.3d at 977. Plaintiffs bear a "heavy" burden to "allege particularized facts that raise a reasonable doubt" that (1) the board's decision was "consistent with its duty of care to act on an informed basis" or (2) the board "acted in good faith, consistent with its duty of loyalty."

13

*Ironworkers*, 2015 WL 2270673, at \*24.  The analysis considers "the time available to the board for response in light of the allegations in the demand." *Rich*, 66 A.3d at 976-78.  However, as the parties acknowledge, "no formula exists" for determining what length of time is reasonable. *Charal Inv. Co. v. Rockefeller*, 1995 WL 684869, at \*3 (Del. Ch. Nov. 7, 1995).  Factors that inform this question include "the complexity of the technological, quantitative, and legal issues raised by the demand." *Allison v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117-18 (D. Del.), *aff'd*, 782 F.2d 1026 (3d Cir. 1985).

The Court agrees with Defendants that, given the complexity of the issues raised in Plaintiffs' Demand and Defendants' efforts to communicate with Plaintiffs, Cigna's failure to render a decision on the Demand before May 3, 2019 – just two and a half months after Plaintiffs served the Demand – does not constitute constructive refusal.  Not only is three months a short time, but here the Demand spans 33 pages, attaches over 300 pages of materials, raises complex subject matter (implicating ongoing litigation), and questions the conduct of nearly two dozen individuals.  Moreover, the Cigna Board timely informed Plaintiffs that it was in the process of considering the Demand.  (D.I. 65 at 7, 10-12 (citing D.I. 66 Ex. A); *see also* D.I. 28 ¶¶ 269,

276; D.I. 28-22 Ex. V)[4]  This conclusion is further supported by the fact that Cigna formally

responded to the Demand on July 2, 2019, within just five months of receiving it.[5]

### 2. The Board Complied With Its Duties Of Loyalty And Care In Handling The Statute of Limitations

Plaintiffs have failed to refute the presumption that the Board engaged in a valid exercise

of business judgment when it chose not to intervene or secure a tolling agreement by May 3,

2019. *See, e.g., Busch ex rel. Richardson Elecs. Ltd. v. Richardson*, 2018 WL 5970776, at *9

(Del. Ch. Nov. 14, 2018) (holding that Board's decision whether to enter into tolling agreement

is exercise of business judgment, to which deference is due).  While Plaintiffs may disagree with

---

[4] Indeed, courts have described as reasonable a response time of over six months. *See, e.g., Friedman v. Maffei*, 2016 WL 1555331, at *6, 16 (Del. Ch. Apr. 13, 2016) (granting defendants' motion to dismiss under Del. Ch. Ct. R. 23.1 and holding board did not wrongfully refuse plaintiff's demand one year after plaintiff sent demand letter); *see also Lowinger*, 2017 WL 1224524, at *4-5 (finding communications from Board updating plaintiffs on status of demand consideration sufficient to demonstrate Board did not constructively refuse demand); *Bravetti*, 2015 WL 1954466, at *6 (dismissing derivative action after considering correspondence between defendant and plaintiff that post-dated complaint and contradicted plaintiff's claim that board ignored demand); *Sprando*, 2011 WL 3055242, at *4 (dismissing derivative action where "undisputed history of correspondence between the Board of Directors and Plaintiff suggests that while there may not have been immediate action, the Board of Directors was in contact with Plaintiff and continuously providing indication that it was aware of, and attempting to rectify, the alleged wrongdoing brought to its attention by Plaintiff's demand request").

[5] Plaintiffs draw the Court's attention to *Ingrao v. Stoppelman*, 2020 WL 7025083 (N.D. Cal. Nov. 30, 2020), as supplemental authority in support of their contention that Defendants' inaction constitutes constructive refusal. (D.I. 100)  *Ingrao*, however, is nonbinding and distinguishable.  In that shareholder derivative suit, the court denied the defendants' motion to dismiss, finding that the board's inaction in response to the plaintiff's demand constituted a constructive refusal. *Ingrao*, 2020 WL 7025083, at *4.  The board had deferred consideration of the demand pending resolution of a related Securities Action; the court had encouraged the defendants to exercise their ability to enter into tolling agreements, but they could not all agree to do so. *Id.* at *2, 4.  The court concluded that the board had stood "idle" and "functionally ignored the demand for ***over a year***" in the face of an expiring statute of limitations. *Id.* at *4. By contrast, Plaintiffs here allege constructive refusal occurred ***less than three months*** after serving their demand. (*See* D.I. 101)  The Board ultimately responded within five months, after assuring Plaintiffs it was considering the demand and after securing tolling agreements. (*See id.*)

the Board's decision not to seek tolling agreements before the deadline for amendment as of right, such a disagreement does not create a reasonable doubt about the Board's good faith and level of care in making that decision. *See id.*

This is especially true considering that the Board notified Plaintiffs that it was aware of their concerns regarding the statute of limitations and secured tolling agreements shortly after Plaintiffs filed the FAC. (D.I. 28-22 Ex. V; D.I. 66 Ex. C) Nor have Plaintiffs argued that any claim became untimely between then and when the tolling agreements were executed on June 12, 2019.[6] Plaintiffs have not pled particularized facts creating a reasonable doubt that the Board's investigation and actions regarding statute of limitations concerns failed to comply with its duties of loyalty or care. *See also Lowinger v. Oberhelman*, 2017 WL 1224524, at *4-6 (C.D. Ill. Mar. 31, 2017), *aff'd sub nom. Lowinger v. Oberhelman*, 924 F.3d 360 (7th Cir. 2019) (rejecting plaintiffs' "vague allegations" that board's "decision to defer and not enter into tolling agreements was in bad faith" where "no one argue[d] Plaintiffs missed the deadline").

The Court need not address the parties' dispute as to whether the Delaware Savings Statute provides yet another basis to defer to the Cigna Board's exercise of business judgment in its handling of the statute of limitations issue. (*See, e.g.*, D.I. 65 at 13 (discussing 10 Del. C. § 8118(a)); D.I. 76 at 13; *see also* Tr. at 28)

### 3.    The Cigna Board Made An Informed Decision In Good Faith

Plaintiffs have failed to "plead facts that show a board decision so inexplicable that a court may reasonably infer that the directors must have been acting for a purpose unaligned with

---

[6] Additionally, although Plaintiffs expressed concerns that the statute of limitations may "commence running" soon, the deadline with which Plaintiffs were most concerned at the time was not a statute of limitations but, instead, only Plaintiffs' deadline for amendment as a matter of right. (*See* D.I. 28 ¶¶ 69-71) Plaintiffs could have requested an extension of this deadline, pursuant to Federal Rule of Civil Procedure 15.

the best interest of the corporation; that is, in bad faith." *Ironworkers*, 2015 WL 2270673, at

*26.  When shareholders make a demand upon the board of directors, the shareholders "tacitly

concede[ ] the independence of a majority of the board to respond." *See Lowinger*, 2017 WL

1224524, at *3 (citing *Levine v. Smith*, 591 A.2d 194, 212 (Del. 1991), *overruled on other*

*grounds by Brehm*, 746 A.2d 244).  To support its argument that the Cigna Board was not

independent or conflicted, Plaintiffs must allege that Defendants "were incapable of acting

disinterestedly in responding to" their Demand.  *City of Tamarac Firefighters' Pension Tr. Fund*

*v. Corvi*, 2019 WL 549938, at *9 (Del. Ch. Feb. 12, 2019).

  Plaintiffs have not done so here.  While Plaintiffs observe that three Cigna directors were

previously on the Express Scripts Board, Plaintiffs agree (as they must) that, at most, only a

quarter of the Board was conflicted with respect to the motion to dismiss.  (*See* D.I. 76 at 17; Tr.

at 24, 32-33)  This does not constitute a majority.  *See Desimone v. Barrows*, 924 A.2d 908, 943

(Del. Ch. 2007) (holding that, for demand excusal purposes in derivative action, "a derivative

complaint must plead facts *specific to each director*, demonstrating that at least half of them

could not have exercised disinterested business judgment in responding to a demand").

  Plaintiffs further fail to allege facts to support their claim that the Board's independence

was in question because pressing forward with Plaintiffs' Demand could have undercut or

compromised Defendants' related litigation.  (*See* D.I. 76 at 18 n.14) (citing *Pfeiffer v. Toll*, 989

A.2d 683, 689 (Del. Ch. 2010))  The Cigna Board was entitled to consider the impact on other

litigation when considering Plaintiffs' Demand.  *See In re Merrill Lynch & Co., Sec. Derivative*

*& ERISA Litig.*, 773 F. Supp. 2d 330, 348 (S.D.N.Y. 2011) (applying Delaware law).

  Plaintiffs have failed to allege facts demonstrating that Defendants' May 9, 2019

response was dilatory and reflective of the Board's "bad faith unwillingness to take the Demand

seriously." (D.I. 76 at 17) To the contrary, the undisputed history of correspondence shows the Board did not ignore Plaintiffs' statute of limitations concerns but, rather, communicated consistently that it was aware of them. *See, e.g., Sprando ex rel. Int'l Game Tech. v. Hart*, 2011 WL 3055242, at *4 (D. Nev. July 22, 2011).

The cases Plaintiffs rely on do not alter this conclusion. In *Milliken v. American Realty Capital Hospitality Advisors, LLC*, for example, the plaintiff argued the board's failure to investigate his claims independently and in good faith between July 2017 and March 2018 amounted to a constructive and *de facto* refusal of his demand. 2018 WL 3745669, at *6 (S.D.N.Y. Aug. 7, 2018). The court there held that "[i]f a board moves to dismiss a case after failing to act on a shareholder's demand, the plaintiff can proceed with the suit if he raises a reasonable doubt that the board's conduct was the product of good-faith business judgment." *Id.* at *7. That is not the situation presented here. Instead, here the Individual Defendants, and not the Board, brought the motion to dismiss for lack of standing, and did so after Plaintiffs lost their Express Scripts shares. (D.I. 24) Moreover, while *Milliken* may rely on Delaware law for guidance, it was decided under Maryland law.

*Rich ex rel. Fuqi International*, 66 A.3d 963, is no more helpful to Plaintiffs. In *Rich*, the Delaware Chancery Court found the plaintiffs' allegations sufficient to raise a reasonable doubt that the board acted in good faith and, hence, refused to apply the protections of the business judgment rule. *See id.* at 979. There, a separate audit committee had begun investigating accounting problems related to the demand's allegations; however, the Board failed to pay the committees' analysts, so the audit was never completed. *See id.* at 970-72. The board also never responded to the demand in writing. *Id.* at 969. Here, unlike in *Rich*, the Board did not fail to respond to the Demand nor abandon its investigation after uncovering wrongdoing.

**B.    Cigna Did Not Act Improperly In Rejecting The Demand**

    **1.    The Court Takes Judicial Notice Of The Demand Refusal Letter**

As a preliminary matter, Plaintiffs argue the Cigna Board's refusal of the Demand, months after it was served, is irrelevant and should not be considered. (D.I. 76 at 15)  They contend that because the Demand was constructively refused at the time the Complaint was filed, Cigna's Demand Refusal Letter sent after Plaintiffs filed their FAC is irrelevant. (D.I. 66 Ex. B) Cigna counters that courts often consider the contents of a demand refusal letter to decide a Rule 23.1 motion. (D.I. 83 at 6) (citing, e.g., *Bresalier ex rel. Duke Energy Corp. v. Good*, 246 F. Supp. 3d 1044, 1054 (D. Del. 2017) (considering content of demand refusal letter and finding that "Board provided multiple, plausible reasons for deciding not to pursue litigation, and [Plaintiff]'s conclusory allegations do not provide a basis to question the Board's exercise of its business judgment")) Cigna explains that here the Demand Refusal Letter "largely recounts the existence and status of various litigation concerning the Anthem contract, as well as prior dismissal decisions." (*Id.*) (citing D.I. 66 Ex. B at 7-9)

When reviewing motions to dismiss, "[c]ourts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *King v. Baldino*, 648 F. Supp. 2d 609, 615-16 (D. Del. 2009), *aff'd sub nom. Baldino*, 409 F. App'x 535 (internal citation omitted).  A court may additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders [and] items appearing in the record of the case." *Id.* (internal citation omitted); *see also Bravetti v. Liu*, 2015 WL 1954466, at *6 (D.N.J. Apr. 29, 2015) (taking judicial notice of correspondence between defendant and plaintiff that post-dated complaint); *see also Sprando*, 2011 WL 3055242, at *4.

Plaintiffs do not dispute that they received the Demand Refusal Letter. Nor have they disputed the facts concerning the pending litigation referenced in it, which in any event are matters of public record and referenced in the FAC. (Tr. at 38-39; D.I. 28 ¶¶ 41, 44) Thus, the Court will take judicial notice of the Cigna Board's Demand correspondence.

### 2.    The Cigna Board Acted Appropriately

The Court agrees with Cigna that Plaintiffs fail to allege facts that show the Board intentionally refused the Demand for a purpose other than advancing the best interests of the corporation, or that the Board failed to act on an informed basis. (D.I. 65 at 15-17) Instead, as Cigna contends, it was a reasonable exercise of business judgment for Cigna, recognizing the significant exposure it faced from the ongoing litigation with Express Scripts (which remained a defendant in two cases collectively seeking billions of dollars in damages), to refuse the Demand. (*See* D.I. 66 Ex. B at 1-5, 7-8; D.I. 28 ¶¶ 41, 44) Taking steps that would hurt Express Scripts in that litigation could quite reasonably have been seen as not being in the companies' interests. (*See* Tr. at 20-22) Moreover, at that time, Express Scripts was prosecuting counterclaims in another suit involving Anthem. (D.I. 66 Ex. B at 7) (citing *Anthem v. Express Scripts, Inc.*, No. 16-cv-02048 (S.D.N.Y Mar. 16, 2020)) This is in addition to all of the other factors the Board also considered, including the early dismissals of similar claims in related litigation with Anthem;[7] the advancement requirements under Delaware law, obligating Cigna to bear the entire cost of litigation, including the defense; and the minimal recovery Cigna could receive from the Individual Defendants. (*Id.* Ex. B at 7-8) All of this is outlined in the Board's nine-page Demand Refusal Letter. (*Id.*)

---

[7] *See In re Express Scripts*, 2017 WL 3278930, at *1; *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 662 (S.D.N.Y. 2018).

Plaintiffs' responses to these conclusions lack merit. Plaintiffs contend that the Board's Demand refusal was not the product of a valid business judgment, that the Board's good faith and investigation are "suspect" given its dilatory response, and that the Demand Refusal Letter lacked sufficient detail. (*See, e.g.*, D.I. 76 at 16-17) (citing D.I. 66 Ex. B) The Board allegedly further failed to provide any indication that it "weighed the potential recovery from the lawsuit" or even "considered the specific merits of bringing the suit." (*Id.*) (citing *Witchko v. Schorsch*, 2016 WL 3887289, at *4 (S.D.N.Y. June 9, 2016))

Plaintiffs have failed to "carry the considerable burden of showing that the decision not to bring the lawsuit was made in bad faith or was based on unreasonable investigation." *Lambrecht v. O'Neal*, 504 F. App'x 23, 27 (2d Cir. 2012). Instead, like the board in *Lambrecht*, the Cigna Board "cited the possible compromise of pending litigation" and compared it with "the low probability of recovery." *Id.* at 27-28. Further, in reaching its decision, the Cigna Board reviewed a number of factors (described above). (*See generally* D.I. 66 Ex. B) On the record the Court may consider here, the Court cannot find that refusal of the Demand "itself [was] in breach of the directors' fiduciary duties." *Ironworkers*, 2015 WL 2270673, at *25.[8] Plaintiffs have not met their high burden to show that the Board's refusal was not the product of a valid exercise of business judgment.[9]

---

[8] Again, the circumstances here differ materially from those which persuaded the court in *Ingrao*, 2020 WL 7025083, at *5-6, that the board's decision to defer consideration of the demand was not entitled to deference under the business judgment rule. The court there noted that the board provided sparse justification for its inaction: the "mere existence" of pending litigation and a statement that acting on the demand would not serve the best interests of the company and its shareholders. *Id.* at *6. By contrast, here, the board cites a number of relevant factors, in detail, that entitle them to deference under the business judgment rule.

[9] Plaintiffs argue there is no evidence that the three Individual Defendants on the Cigna Board abstained from considering the Demand. (D.I. 76 at 17-18) But the Individual Defendants made

### C.    Collateral Estoppel Requires Dismissal Of The Securities Fraud Claims

The Court agrees with the Individual Defendants that the securities fraud claims against them must be dismissed based on application of collateral estoppel arising out of the prior Securities Action. As the Individual Defendants argue, because Express Scripts was a party to the Securities Action and benefitted from the rulings in its favor, the dismissal of that action with prejudice has a binding collateral estoppel effect on Express Scripts and bars Plaintiffs' double derivative claims. (D.I. 69 at 8-9)

In May 2016, Express Scripts stockholders filed the Securities Action as a putative class based on the same alleged misstatements and omissions Plaintiffs allege here. In May 2018, the court dismissed that case with prejudice. *See In re Express Scripts Holding Co. Sec. Litig.*, 2018 WL 2324065, at *1 (S.D.N.Y. May 22, 2018). The Second Circuit later affirmed judgment. *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13-14 (2d Cir. 2019). Specifically, the Second Circuit affirmed the holdings that: (i) "no reasonable investor could have found the statements, in light of the overall context, to be false, misleading, or incomplete," (ii) Express Scripts "did not have a duty to disclose more about the uncertain state of the negotiations;" and (iii) its "accounting treatment was not materially misleading or false." *Id.*

Collateral estoppel applies where "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (internal citation omitted). Each of these elements is present here.

----

up only a quarter of the Board. Their participation could not have rendered the Board not-independent.

The alleged misstatements at issue here are identical to those rejected in the Securities

Action. For example, Plaintiffs contend that Express Scripts' accounting treatment of the

Anthem Contract under generally accepted accounting principles ("GAAP") was misleading

because it required Anthem's accountants to expect a "high probability" of contract renewal.

(D.I. 28 ¶ 150 (2015 Form 10-K); *Id.* ¶ 239 (2016 Form 10-K)) The Securities Action involved

and rejected the same allegation. *See In re Express Scripts*, 773 F. App'x at 14; *compare also id.*

at 13 (finding alleged misstatements "suggest only the hope . . . that the talks would go well"),

*with* D.I. 28 ¶¶ 151, 178 (same allegations regarding investor calls). The identical issue of

whether the alleged misstatements here violated federal securities laws was actually litigated in

the Securities Action, resulting in a final judgment on the merits. Collateral estoppel applies.

Plaintiffs' various arguments for avoiding the application of collateral estoppel all fail.

Plaintiffs argue that collateral estoppel cannot apply because there is no privity between

Plaintiffs and the parties to the Securities Action. (D.I. 75 at 11) In fact, however, Express

Scripts – which was the prevailing party in the Securities Action – is the true Plaintiff here.

Because this is a double derivative suit, Plaintiffs' claims are asserted on behalf of Express

Scripts (as a purchaser of its own securities). (*See* D.I. 28 ¶ 297 (alleging "fraud . . . in

connection with the Company's repurchase of its own shares"); *see also Hamilton Partners, L.P.*

*v. Englard*, 11 A.3d 1180, 1199-1200 (Del. Ch. 2010) (explaining that derivative suits are

brought on behalf of, and for benefit of, corporation)) Because Express Scripts obtained a final

judgment in the Securities Action, Express Scripts is now bound by (and here benefits from) the

overlapping holding from that case. *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402

U.S. 313, 333 (1971).

Plaintiffs argue Express Scripts did not have an opportunity to pursue the instant claims because it was a defendant in the Securities Action. But Plaintiffs concede that Express Scripts fully litigated the securities fraud claims in the Securities Action. (Tr. at 73-74) Plaintiffs further concede that, in the instant case, they are attempting to bring suit under Rule 23.1, on behalf of the company, and not the shareholders. (*Id.*) Thus, it would be illogical for Express Scripts – having obtained a victorious final judgment from the Second Circuit that there were no false and misleading statements – to then sue its former directors and officers for making false and misleading statements. Plaintiffs' reliance on *El Pollo Loco Holdings, Inc.* does not help them, as that case did not involve a final order in the related securities action. (*See* Tr. at 74-77; D.I. 81 at 3; D.I. 75 Ex. 6 at 14) All of this further confirms the failings of Plaintiffs' privity arguments.

Plaintiffs argue that the Securities Action dismissal cannot have preclusive effect because, subsequent to filing that action, Plaintiffs prevailed in their Section 220 action and now have documents (not utilized in the Securities Action) revealing misleading statements were made by Express Scripts directors and officers. (D.I. 75 at 2) (citing D.I. 28 ¶¶ 142, 158, 167, 174-75, 191-92, 207, 210-12) However, "issue preclusion may be used to prevent the introduction of new facts to undermine a finally determined issue." *Alevras v. Tacopina*, 226 F. App'x 222, 231 (3d Cir. 2007). Indeed, once an issue is raised and finally determined, the entire issue is precluded, not just the particular arguments raised in support of it in the first case. *See id.* Plaintiffs' cursory attempt to distinguish *Alevras* is unpersuasive. (*See* D.I. 75 at 10 n.12)

Moreover, as the Individual Defendants persuasively explain, the Section 220 documents do not, even if considered, make any difference. (D.I. 81 at 4) These documents demonstrate that the Board recognized the potential loss of a major contract and risks associated with the

Anthem relationship. (*See, e.g.*, D.I. 28 Ex. G (Mar. 4, 2015 Board Presentation); *id.* Ex. S (Sept. 9, 2015 Board Materials)) They do not, however, reveal director knowledge that the relationship would fail. (*See, e.g., id.* Exs. K, L (May 6, 2015 Board Meeting Minutes and Presentation))[10] Plaintiffs have failed to demonstrate how the statements in these documents are inconsistent with Defendants' public statements. (*See, e.g.*, D.I. 70 Ex. 6 at 20) (Express Scripts' 2014 Form 10-K warns in its "Risk Factors" that "[a] substantial portion of our business is concentrated in certain significant client contracts" (i.e., the Anthem Contract))

Finally, Plaintiffs argue that collateral estoppel only bars a party from relitigating an issue on which it received an ***adverse*** determination in the prior action. (D.I. 75 at 11) (citing *Del. River Port Auth. v. Fraternal Ord. of Police*, 290 F.3d 567, 573 n.10 (3d Cir. 2002) (stating preclusion is appropriate when issue is "directly determined adversely to the party against whom estoppel is asserted"); *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 845 (3d Cir. 1974) (stating collateral estoppel bars "a party from re-litigating a claim which he lost in the prior controversy")) Contrary to Plaintiffs' assertion, an adverse determination is not a prerequisite for collateral estoppel to apply. (*See* Tr. at 71, 74-75) Cases, including those cited by Plaintiffs, require only a final – and not necessarily adverse – determination. *See, e.g., Alevras*, 226 F. App'x at 231 ("Under either set of facts, however, the ultimate question has already been

---

[10] Furthermore, the documents reflect the Board's commitment to ***maintaining*** the Anthem relationship. For example, the Individual Defendants cite management's statements that: (i) "enhancing and extending our Anthem relationship . . . remain[s] [a] top priorit[y]"; (ii) "we continue to engage with Anthem at all levels of the organization;" and (iii) "[w]e committed both verbally and in writing to work quickly with Anthem to address these issues and perceived issues as quickly as possible, many of which were already in process as part of our normal working relationship." (D.I. 81 at 5) (citing D.I. 28 Ex. G at ES00003721, ES00003733-34) They further highlight management's explanation that "our relationship with our largest client clearly needs even greater focus to ensure we maintain an optimal relationship with Anthem." (*Id.*) (citing ES00003734)

decided."); *Del. River Port Auth.*, 290 F.3d at 575 ("Issue preclusion is proper when factual differences are of no legal significance whatever in resolving the issue presented in both cases.") (internal citation and quotation marks omitted); *Scooper Dooper*, 494 F.2d at 845 (holding collateral estoppel applies if three requirements, none of which were prior adverse determination, are satisfied). While Plaintiffs point to language stating the elements of collateral estoppel in a manner noting that the prior decision was adverse, they have not pointed to any case that considers the question and decides that the prior decision ***must*** be adverse.

Accordingly, the Court will grant the Individual Defendants' motion to dismiss the Securities Fraud claims against them.

**D.     Plaintiffs Also Fail To State A Securities Fraud Claim**

Even if collateral estoppel did not apply, Plaintiffs have failed to adequately allege a Securities Fraud claim on which relief may be granted. To state a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Plaintiffs must plead (1) that Defendants made a false or misleading statement, (2) with scienter, (3) in connection with the purchase or sale of a security, and (4) that Plaintiffs relied on the misrepresentation or omission. *Dura Pharms.*, 544 U.S. at 341-42. The Individual Defendants argue that Plaintiffs' claims fail with respect to elements (1), (2), and (4). Because the Court agrees with the Individual Defendants on (1) and (2), and any single failing is fatal, the Court will not address the parties' arguments with respect to (4). Again, the Court will grant the Individual Defendants' motion to dismiss the Securities Fraud claims.

**1.     Plaintiffs Fail To Allege False Or Misleading Statements**

Plaintiffs cite a number of alleged misrepresentations and omissions regarding the likelihood of Express Scripts and Anthem renewing their Contract. (*See, e.g.*, D.I. 28 ¶¶ 151,

178, 180, 193, 205-06, 211, 223-27, 239-40, 241-42, 252, 254)  For example, Plaintiffs argue

that the following representations were false or misleading:

> (1) Defendants' description of the Anthem relationship as "great" and "very solid." (*Id.* ¶ 151)
>
> (2) The company's public statements that contradicted the Board's 2015 presentation identifying the Anthem relationship as its "most significant risk." (*Id.* ¶ 164)
>
> (3) The company's statement that, "Anthem is an incredibly important client to us.  And I think we do very good things together.  So we really enjoy that relationship.  We really enjoy providing services to their members. . . .  So I do think it is a two-way street." (*Id.* ¶ 178)
>
> (4) Defendants' representation to the Board that the company's "most critical payor to secure remains Anthem.  Although [the Anthem Contract] runs through 2019, [the Company is] exploring an extension to secure the base," given that "it was clear that the Company no longer believed it was 'probable' that the Agreement would be extended five years beyond the contract's expiration in 2019." (*Id.* ¶ 193)

These statements do not demonstrate that the Individual Defendants knew the Anthem

relationship would fail.  Instead, the alleged misrepresentations indicate the Board understood

the ***risk*** posed by the Anthem Contract, yet was committed to maintaining the Anthem

relationship. (*See, e.g.*, D.I. 28 Ex. G (March 4, 2015 Board Materials); *id.* Ex. K, L (May 6,

2015 Board Meeting Minutes and Presentation))  These risks were disclosed to investors in

Defendants' 2014 Form 10-K, filed on February 23, 2015.  (D.I. 70 Ex. 6)  At best, Express

Scripts' assessments were overly optimistic about its negotiations with Anthem.  They do not,

however, rise to actionable and materially misleading statements under Section 10(b). *See, e.g.*,

*Schwartz v. Perseon Corp.*, 175 F. Supp. 3d 390, 402 (D. Del. 2016) ("[N]on-specific

statement[s] of optimism or hope that a trend will continue . . . have been almost uniformly

rejected by the courts as a basis for a securities fraud claim.") (internal citation omitted).

Plaintiffs further allege that Express Scripts' 15-year amortization of the Anthem Contract constituted a GAAP error and misstatement because it reflected the company's belief that there was a "high probability" of contract renewal. (D.I. 75 at 1-2) Specifically, they allege that Express Scripts had internally changed the amortization of the Anthem Contract to ten years, a modification it allegedly hid from investors for over a month. (D.I. 28 ¶¶ 135-37, 254)

The Individual Defendants contend there was no GAAP error or misstatement. In their view, Plaintiffs invented this "high probability" standard based on Express Scripts' statement to the SEC in April 2010 that management considered renewal highly probable. (D.I. 81 at 7) Defendants, however, note that the applicable GAAP standard, FASB 350-30-35-2, only requires a contract to be amortized over its useful life, which is "the period over which the asset is expected to contribute directly or indirectly to the future cash flows." (*Id.*) (citing D.I. 70 Ex. 13) This involves an exercise of judgment and turns on a subjective balance of several factors, including "[t]he entity's own historical experience in renewing or extending similar arrangements . . . regardless of whether those arrangements have explicit renewal or extension provisions." (*Id.*)

Express Scripts' amortization of the Anthem Contract does not reflect a GAAP error or knowing misstatement. Defendants did not recite the GAAP standard, but rather their view that renewal was a "high probability" based on the company's historical relationship with Anthem. (Tr. at 77) ("Historically, . . . negotiations have resulted in a renewal. And in this instance . . . that's what the company had expected.") Plaintiffs' allegations do not "plausibly demonstrate that defendants knew, nor even had reason to know, at any specific time during [that] period that [the Contract] was overvalued." *In re Express Scripts*, 773 F. App'x at 14.

### 2.    Plaintiffs Fail To Allege Scienter

Plaintiffs argue they have met the scienter requirement because the FAC pleads "facts constituting strong circumstantial evidence" that the Individual Defendants knew of the failing state of the Anthem relationship yet continued to publicly tout the "high probability" that the lucrative Agreement would be renewed.  They argue that in considering all the facts collectively and in the context of the Section 220 documents, the misstatements and omissions evidence "an extreme departure from the standards of ordinary care" and a danger of misleading investors that was either known to the Individual Defendants or so obvious that they must have been aware. (D.I. 75 at 15) (citing *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 830 (D.N.J. 2006))

Plaintiffs' allegations lack the requisite particularity under the applicable heightened pleading standards.  Plaintiffs cite board meeting attendee lists and meeting minutes (*e.g.*, D.I. 28 ¶ 181 n.51; *id.* Ex. K; *id.* ¶ 205 & n.67, 68, Exs. R-S; *id.* ¶ 252 n. 96, 97), but these documents do not provide specific factual allegations that each Individual Defendant had the motive and opportunity to commit fraud, or facts demonstrating conscious misbehavior or severe recklessness. *See In re Burlington Coat Factory*, 114 F.3d at 1418.  Further, the FAC groups all 18 Individual Defendants together without describing any specific knowledge of fraud.  This is insufficient.  "[P]laintiffs may not make general allegations of scienter against a collective group of defendants; they must 'specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions.'" *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 420-21 (D. Del. 2009) (quoting *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 335-36 (3d Cir. 2007)).  Nor do Plaintiffs allege facts to support a motive for the Individual Defendants to artificially inflate Express Scripts' stock price.  Accordingly,

29

Plaintiffs fail to "allege specific facts that constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *GSC Partners*, 368 F.3d at 238.

### E.    Plaintiffs Fail To State A Claim For Breach Of Fiduciary Duty Or Corporate Waste

Finally, Plaintiffs have also failed to state claims on which relief may be granted for either breach of fiduciary duty or corporate waste.

Plaintiffs allege that the Individual Defendants breached their fiduciary duties by causing or allowing Express Scripts to breach the Anthem Contract and violate the federal securities laws, subjecting the Company to numerous lawsuits. (D.I. 28 ¶¶ 2, 43-44, 110)  Defendants, however, correctly argue that even if Express Scripts violated "positive law," the FAC does not allege that the Individual Defendants *knew* Express Scripts was "violating the law or even engaging in the conduct that risked violating the law." (D.I. 69 at 14) (citing *Hays v. Almeida*, 2019 WL 3389172, at *3 (Del. Ch. July 26, 2019), *aff'd*, No. 371, 2019 (Del. Apr. 9, 2020) ("[E]ven when illegality is involved, an oversight claim against directors requires allegations sufficient to support an inference of scienter."))

Moreover, the Individual Defendants argue that Express Scripts' charter eliminates monetary liability for breaches of the duty of care; hence, Plaintiffs' fiduciary duty claims (loyalty, disclosure, and oversight) must plead bad faith, which Plaintiffs have failed to do. (*Id.*) They also argue that Plaintiffs inappropriately rely on group pleading and have failed to make allegations as to each particular Individual Defendant. *See Owens ex rel. Esperion Therapeutics, Inc. v. Mayleben*, 2020 WL 748023, at *7 (Del. Ch. Feb. 13, 2020) (dismissing *Caremark* claim alleging failure to exercise oversight of corporate disclosures because complaint "contains not one particularized allegation of intentional misconduct as to a single Outside Director").

The Court agrees with Defendants. For the same reasons the federal securities claims fail, Plaintiffs' breach of fiduciary duty claims fail. The FAC fails to identify false and/or misleading statements. Moreover, Plaintiffs have not alleged specific facts about any Individual Defendant, with particularity, that they knowingly caused Express Scripts to make false disclosures, or in bad faith consciously disregarded red flags that should have alerted them to the purported falsity of Express Scripts' public disclosures.

With respect to the corporate waste claim, Plaintiffs argue that the Individual Defendants "were well aware that the Company's largest customer was not only dissatisfied with the Company's servicing of its account, but was taking measured steps to terminate its complete business relationship." (D.I. 75 at 20) But Plaintiffs' waste claims do not plead or argue that there was "an exchange that [was] so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Warhanek v. Bidzos*, 2013 WL 5273112, at *9 (D. Del. Sept. 18, 2013) (internal citation omitted). The stock buyback allegation falls short of "egregious or irrational," even when paired with alleged stock price inflation. *See Staehr v. Mack*, 2011 WL 1330856, at *3, 9 (S.D.N.Y. Mar. 31, 2011).

Accordingly, the Court will dismiss the breach of fiduciary duty and corporate waste claims against the Individual Defendants.

**F.    Dismissal Will Be With Prejudice**

Given the Court's conclusions as to the multiplicity and substance of deficiencies with Plaintiffs' pleading, amendment would be futile. Additionally, allowing the filing of yet another complaint would be unfairly prejudicial to Defendants. *See, e.g., Bresalier*, 246 F. Supp. 3d at 1055 n.9; *see also* Tr. at 17-18 ("[W]hen Cigna rejected the demand, it expressly offered the plaintiffs the opportunity to hit the pause button, to digest the actual refusal. If plaintiffs wanted

31

to attack the actual refusal, they should have done so then, and they've been sitting on the actual refusal. In their briefing, they could have told us how they were going to amend. They didn't do any of that."). Therefore, the Court will not grant Plaintiffs leave to amend. *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993) (citing "undue delay, bad faith or dilatory motive on the part of the movant" and "futility of amendment" as reasons to deny leave to amend (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962))); *see also Arthur v. Maersk, Inc.*, 434 F.3d 196, 203 (3d Cir. 2006) (explaining that "prejudice to the non-moving party is the touchstone for the denial of an amendment" (internal citation omitted)).

## V.    CONCLUSION

For the reasons set forth above, the Court will grant both Cigna's and the Individual Defendants' motions to dismiss the FAC in its entirety with prejudice. An appropriate Order follows.